In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3021

JESSICA BENUZZI,

*Plaintiff-Appellant*,

*v.*

BOARD OF EDUCATION OF THE
CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 3510—**Suzanne B. Conlon**, *Judge.*

ARGUED MARCH 30, 2011—DECIDED JULY 21, 2011

Before FLAUM, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Jessica Benuzzi, one of the first female custodians hired by the Chicago Public Schools, has spent more than twenty years climbing the ranks of the maintenance staff. In 2004, she reached the Grade V-II Engineer level, which qualified her to oversee custodial operations at large school buildings. With this promotion came a new job, building engineer-in-charge, at a newly

opened school on Chicago's south side, John J. Pershing West Magnet School. The promotion also put Benuzzi under the command of a new boss with whom she immediately clashed, principal Cheryl Watkins. Watkins declined Benuzzi's repeated requests to work the morning shift, and suspended her without pay three times. Benuzzi responded by filing four complaints with the Equal Employment Opportunity Commission ("EEOC"), alleging gender, race, age, and disability discrimination and retaliation. When she received her right-to-sue letter, Benuzzi sued Watkins and the Board of Education of the City of Chicago on all of the grounds she asserted before the EEOC. Watkins and the Board moved for summary judgment. Benuzzi submitted a statement of additional facts in opposition to summary judgment, which the district court largely ignored because its "excessively lengthy paragraphs" violated Local Rule 56.1. The district court, relying mainly on Watkins' and the Board's factual submissions, granted summary judgment in their favor on all Benuzzi's claims. Benuzzi challenges the grant only as to her gender discrimination and retaliation claims. She also challenges the district court's application of Local Rule 56.1. For the reasons explained below, we affirm in part, vacate in part, and remand for further proceedings.

## I.  Local Rule 56.1

We first address Benuzzi's contention regarding Local Rule 56.1, for our resolution of this issue has the potential to significantly impact the scope of this appeal.

Like most, if not all, federal judicial districts, the Northern District of Illinois has promulgated local procedural rules to aid it in managing its docket effectively and efficiently. *See* Fed. R. Civ. P. 83 (authorizing district courts to "adopt and amend rules" consistent with federal rules of civil procedure); *A. Bauer Mech., Inc. v. Joint Arbitration Bd. of the Plumbing Contractors' Ass'n & Chi. Journeymen Plumbers' Local Union 130, U.A.*, 562 F.3d 784, 790 (7th Cir. 2009) (explaining the purpose of local rules). "[W]e have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) (quotation omitted); *see also Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004).

The rule at issue here is Local Rule 56.1, which governs summary judgment and provides in relevant part,

> Each party opposing a motion filed pursuant to Fed. R. Civ. P. 56 shall serve and file—
>
> . . . .
>
> (3) a concise response to the movant's statement [of material facts] that shall contain: . . .
>
> (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. Absent prior leave of Court, a respondent to a summary judg-

ment motion shall not file more than 40 separately-
numbered statements of additional facts.

N.D. Ill. Civ. R. 56.1 (b)(3). Benuzzi attempted to comply
with LR 56.1 by filing a statement consisting of forty
numbered paragraphs that included citations to the
record. The paragraphs in her statement ranged in
length from two to eighteen lines. On average, each
paragraph contained about 8.5 lines. Benuzzi moved to
strike portions of defendants' joint statement of facts,
but the defendants voiced no opposition to hers. To
the contrary, they filed a formal response to Benuzzi's
LR 56.1 statement, indicating which additional facts
they disputed.

   The district court was not as amenable. It explained in
its memorandum and opinion and order granting the
defendants' summary judgment motions that it had
disregarded much of Benuzzi's LR 56.1 statement. Citing
the portion of LR 56.1 excerpted above, the district court
explained that it declined to consider much of Benuzzi's
statement of additional facts because most of her para-
graphs were "excessively lengthy." The district court
refused to "wade through Benuzzi's convoluted narra-
tives" and to that end declined to "consider factual state-
ments that fail to comply with Local Rule 56.1." *Benuzzi v.
Bd. of Educ. of the City of Chi.*, No. 09 CV 3510, 2010
WL 2169488, at *1 (N.D. Ill. May 27, 2010). Without clari-
fying which statements those might be, it looked pre-
dominantly to the defendants' factual statements and
determined that summary judgment was warranted. (The
longest paragraph in the defendants' statement of facts

contained eight lines.) From the citations in the opinion, it appears that the district court expressly considered only four paragraphs from Benuzzi's statement; those paragraphs ranged in length from four to seven lines.

District courts have broad discretion to enforce and require strict compliance with their local rules. *See Elustra v. Mineo*, 595 F.3d 699, 710 (7th Cir. 2010) ("We defer to the district court's understanding of its own rules."). The district judge in this case has expressed, through her publicly available standing case management procedures, that she strictly enforces LR 56.1's forty-paragraph limit. She is well within her authority to require such compliance, and we commend her for clearly communicating her high expectations to litigants appearing before her. The lack of similar transparency with respect to her interpretation of LR 56.1's requirement of "short . . . paragraphs" for the purposes of this case gives us some pause, however. "Short" is, after all, a somewhat subjective term; what is "short" to one judge may be long to another, and a single judge's definition might reasonably vary from case to case. It appears that Benuzzi and the court had different ideas about what "short" meant in this fact-intensive case. Some of the paragraphs in Benuzzi's statement of additional facts were objectively not short; most people would probably agree that an eighteen-line paragraph is not a short paragraph. But many of Benuzzi's statements fell into a grayer zone: is an eight-line paragraph "short"? What about a ten-line or twelve-line paragraph? We do not expect district courts to provide litigants with a concrete cutoff; such a requirement would improperly cabin the

district courts' discretion. But district courts might prevent disputes like this one by giving litigants a brief opportunity to revise their offending statements before striking them, or at the very least clarifying which paragraphs fail to meet the rule's requirements. Here, we are not sure what facts the district court considered or disregarded; there are several paragraphs shorter than or equal in length to the ones it cited that it apparently declined to consider.

It seems that the parties are similarly vexed. Benuzzi's appellate briefing relies heavily on citations to her statement of additional facts, which may or may not have been considered by the district court, and the defendants' briefing provides us with facts that were clearly not considered below, *see Benuzzi,* 2010 WL 2169488, at *1 n.2, as well as lengthy recitations of the very facts it claims were properly stricken. At oral argument, we asked both sides to clarify which facts were properly before us. Benuzzi urged us to consider the entirety of her statement of additional facts. The defendants agreed that "everything in the record is available to this court for review." So while we decline to hold that the district court abused its discretion here, largely because of Benuzzi's failure to seek clarification or leave to file a lengthier statement, *see* N.D. Ill. Civ. R. 56.1 Committee Comment ("A party may seek leave to file more asserted statements of . . . additional fact, upon a showing that the complexity of the case requires a relaxation of the . . . 40 statement limit."), we will accede to the parties' request to consider facts that the district court may have disregarded.

## II. Factual Background

With the antecedent procedural question resolved, we proceed to the facts the parties have presented. We view the facts in the light most favorable to Benuzzi, the nonmoving party, and draw all reasonable inferences in her favor. *E.g.*, *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1022 (7th Cir. 2011).

Benuzzi is a white woman in her early fifties. She has been working for the Chicago Public Schools ("CPS") since 1981, when she became one of its first female custodial assistants. She worked her way up to the position of building engineer by the late 1980s, and currently holds one of the highest seniority rankings, 13 of 723. The next-most-senior females hold numbers 86 and 127. In 2004, Benuzzi attained the rank of Grade V-II engineer, which qualified her to serve as the engineer-in-charge at a large school. Shortly after attaining this rank, Benuzzi applied for and was granted a transfer from Thorp Academy to Douglas Academy, which was closed for major renovations and was slated to reopen under new administration during the 2005-2006 school year. Benuzzi was the only CPS worker on site and was tasked with supervising the renovation crews.

In March 2005, the Board hired Cheryl Watkins, an African American woman in her forties, to be the principal of the new school replacing Douglas Academy, John J. Pershing West Magnet School ("Pershing"). The Board told Watkins that she could personally select all her staff members except for custodial employees, who were subject to special union contracts. Watkins toured

Pershing in late May 2005, while construction was on-going. She had her first encounter with Benuzzi at this time. Both sides agree the women got off on the wrong foot; Watkins believed she misplaced her ring during the visit and Benuzzi felt that Watkins was accusing her of stealing it. (Watkins later found the ring at home.) At some point during the summer, Watkins questioned why Benuzzi was permitted to be in the building during construction.

In June 2005, CPS sent a lower-ranked male engineer, Osvaldo Alverado, to assist Benuzzi in getting Pershing ready to open by September. Both Benuzzi and Alverado worked overtime to get the building ready. Benuzzi testified that at some point during the summer, Watkins told Benuzzi that she (Watkins) would be closing Benuzzi's position because she only needed one engineer and Alverado was better for the job. Watkins learned she could not do so, however, because the union contract required the assignment of two engineers in buildings the size of Pershing. Thus, around that same time, Watkins assigned Alverado to work the 6 a.m. to 2 p.m. shift during the school year, and gave Benuzzi the 10 a.m. to 6 p.m. shift. According to Benuzzi, the union contract permitted the chief engineer to set the engineers' schedule subject to the principal's approval, but Watkins ignored her preferences. Benuzzi none-theless conceded during her deposition that "Ms. Watkins had complete authority to do all the scheduling."

Alverado failed to show up over Labor Day weekend, the last weekend before the start of the school year, so Benuzzi wound up working thirty-six hours straight. Benuzzi

testified that Watkins was the only other person she saw there on the holiday. A CPS consultant, John DeSimone, testified that he walked through the building sometime that weekend to make sure it was sufficiently safe and clean to allow students to enter it the following Tuesday. DeSimone testified that "there was [sic] some issues between the engineer and the principal," but "the building was clean and safe for the students to come into." Pershing opened on time. Two weeks later, on September 16, 2005, Watkins, who believed the building was unacceptably dirty on the first day of school, issued Benuzzi a cautionary notice (a written warning) alleging she incompetently or inefficiently performed her duties. The notice provided, "Several members of the Operations Department, including Mr. John DiSimone [sic] . . . visited the building and noticed the unsatisfactory state of the building the day before students were to arrive. The amount of dust on the floors, from the construction work being completed, imposed undue health issues on students with asthma . . . and those who have allergies. The building could have been cleaned properly before students were to be in the building." Benuzzi refused to sign this cautionary notice, as well as a second one Watkins gave her that same day for allegedly raising her voice and initiating "private conversation . . . in the presence of visitors and workmen" on Labor Day.

At some point, Alverado left Pershing and CPS replaced him with Jeff Vaughn, a male Grade II engineer. Watkins assigned Vaughn to work the 6-2 shift and kept Benuzzi on the 10-6 shift. In March or April 2006, the Board visited

Pershing to assess its cleanliness. The Board assigned Pershing a score of 97.1 out of a possible 100.

In May 2006, Benuzzi injured her hand on a patio door. When she arrived at work on May 15, she saw that a "blood clot or puddle" had formed in her hand and decided it would be prudent to seek medical attention. Benuzzi went to the office to seek permission to leave the building. Neither Watkins nor assistant principal Durrell Anderson was available. Benuzzi waited for about forty-five minutes to no avail. Eventually, Benuzzi told the school clerk that she had to get to the doctor. The school clerk told Benuzzi that she would tell Watkins that Benuzzi was at the doctor. Benuzzi tried to reach Watkins by phone from the doctor's office, but was again only able to reach the school clerk. Watkins testified that she did not know that Benuzzi had left and spent time looking for her because a construction worker had a question. Watkins testified that if Benuzzi's injury had been an emergency, the school clerk would have told her; otherwise, notifying Watkins of her absence was Benuzzi's responsibility.

On or about June 9, 2006, Pershing held its end-of-year awards ceremony. A school aide asked Benuzzi if she could arrange for the custodians to carry some beverages upstairs for the evening event. Benuzzi explained that because the custodians' shifts ended at 6:30, they would have to bring the beverages up no later than 6:15. The aide balked, as the beverages were not needed until later in the evening. Benuzzi asked the aide if the people who would be consuming the sodas were going to get

overtime pay; she hoped the custodians might be able to get some overtime for helping with the beverages. It is unclear whether or how the aide answered the question. Benuzzi herself had previously agreed to work until 6:30 p.m. to ensure that an engineer was present at the start of the evening ceremony; Vaughn was scheduled to come in at 7:00. (It is not clear whether she or Vaughn received overtime pay.) Vaughn refused to help Benuzzi set up and instead sat at her desk with his feet up while she worked.

On June 12, Watkins called Benuzzi into her office and told her that "overtime was none of [her] business." Benuzzi testified that Watkins said "some terribly mean things" to her during this meeting, including that Pershing was "her territory" and that she didn't want Benuzzi in the building. Benuzzi, who suffers from anxiety and irritable bowel syndrome, found the meeting very stressful. She felt her heart racing and developed a sharp pain and cramping in her stomach. She "doubled over" and "let out an 'ow,'" which Watkins described as a "guttural scream." Benuzzi, still bent over, then stood up and told Watkins she had to leave to see a doctor. Watkins told her to take her things because she was going to make sure Benuzzi was not allowed back. On June 16, Watkins drafted a memorial of the June 12 meeting in which she expressed concern about Benuzzi's "erratic, unpredictable behavior" and fear that Benuzzi "will do something to the custodians, the assistant engineer, one of the students, or myself." Watkins also formally requested that Benuzzi submit to a fitness for duty examination. Benuzzi was deemed fit

but did not return to Pershing until July 13. While Benuzzi was gone, Vaughn told Watkins that one of the custodians, Willie Rush, was spending inordinate amounts of time in the restroom, sleeping on the job, and using profane language; Watkins investigated and suspended Rush for two days.

On July 17, another custodian, Charles Armour, told Benuzzi that he had asked Vaughn to help him take apart a table, but Vaughn had refused. Benuzzi found Vaughn and asked him to help her take apart the table. Vaughn told her that he did not have to listen to her and refused to help. He then turned on a vacuum and said he couldn't hear her. Benuzzi returned to her office. Before she could do anything, the phone rang. Watkins, who was out of town at a conference, was on the other end. Benuzzi told Watkins she was glad she had called because there was a situation with Vaughn. Watkins responded that she was actually calling because Vaughn had called her to report that Benuzzi had just confronted him, accused him of defacing a photograph of custodian Rush she displayed on her desk, and called him "a pussy, a liar, and a snitch." Benuzzi denied the accusations. Then, according to Benuzzi, the phone inexplicably went dead. Watkins called back and she and Benuzzi discussed whether Benuzzi would be able to come in early the next day. On July 21, Benuzzi emailed Watkins to request a change in her work schedule. She asked Watkins to put her on the 6-2 shift because she had more experience than Vaughn and felt the scheduling change "would be beneficial for the moral [sic] of the custodial staff." Watkins denied Benuzzi's request by

letter dated July 25, explaining that she "fe[lt] it is best" that Benuzzi keep the 10-6 shift.

On July 22, Watkins issued Benuzzi a Notice of Disciplinary Action, which is more serious than a cautionary notice; it is a harbinger of formal disciplinary proceedings. In the notice, Watkins cited Benuzzi for leaving Pershing without permission on May 15 (for her doctor's appointment). The notice also addressed the alleged July 17 incident with Vaughn. The description of the incident was "per Mr. Jeff Vaughn" and outlined his view of the encounter. Vaughn claimed in the notice that Benuzzi "has seemed very angry" and "complained to several people including myself about not receiving thank you notes from the kids in the school." He stated that he "feared for his safety." The notice also alleged that Benuzzi hung up on Watkins while Watkins was still speaking to her on July 17, and stated that several conference attendees had heard Watkins exclaim that Benuzzi hung up on her at the time.

Benuzzi and her union representative contested the charges. The union rep testified that Benuzzi had not used a curse word in years and that she did not say "those things" to Vaughn. Benuzzi testified that she hung up because she thought Watkins was not on the phone anymore. Watkins nevertheless found the charges to be substantiated and recommended that Benuzzi be suspended without pay for fifteen days. Benuzzi appealed the suspension to the Board. A hearing officer heard testimony from Watkins, Benuzzi, and her union rep. He credited Watkins' testimony and upheld the

suspension. Benuzzi testified that she has no evidence that the hearing officer was influenced by her gender, but she believes he inappropriately placed the burden of proof on her rather than Watkins.

Benuzzi served her suspension in September. On October 3, 2006, she filed a gender discrimination complaint with the EEOC. In November, she sent Watkins an unsolicited email in which she stated her willingness to "work any hours assigned to [her]." In December, Vaughn transferred out of Pershing and was replaced by a male Grade II engineer, Sabian Haynes. Watkins scheduled Haynes to work the 6-2 shift and kept Benuzzi on the 10-6 shift. On January 17, 2007, Benuzzi added allegations of age, race, and disability discrimination as well as retaliation to her EEOC claim.

On January 29, 2007, Benuzzi sent Watkins a one-sentence email in which she asked to work the 6-2 shift because Haynes was only a substitute. Watkins denied the request via email the next day. Watkins stated that she never "consider[ed] the rank of the individual in the Grade II position, nor the position, as it relates to the morning shift." She also claimed that Benuzzi had recently told her that she worked better in the evenings and that she would "need to be off on many days because of [her] stomach condition." Watkins asked, "If you are not able to come to work, who would open the building?"

In late February or early March 2007, Benuzzi became concerned about receipts that had gone missing from her desk during her extended absence the previous June.

She believed that Vaughn took the receipts and had been inappropriately reimbursed for the expenditures they detailed. After emailing back and forth with Watkins and assistant principal Anderson, Benuzzi approached Anderson in person on the afternoon of March 16, 2007, to ask how long the school retained receipt records. Anderson led Benuzzi over to Watkins, who was standing in the hallway having a conversation with a member of the local school council. Benuzzi asked Watkins her question, and Watkins raised her voice and told Benuzzi the budget was closed and that she would not look into the matter. Benuzzi attempted to explain that she believed Vaughn had misappropriated school funds, and Watkins told her to call the union. As Benuzzi walked away, she saw a student sitting on a nearby bench. She testified that she told him, "Sorry about that, we were a little loud." She then heard Watkins say to the school council member, "Do you see how she talks to me?"

A few days later, Benuzzi met with Watkins, Vaughn, and some union representatives to discuss the alleged misappropriations. Vaughn was not disciplined. On March 21, 2007, however, Benuzzi received a Notice of Disciplinary Action. The notice did not mention the receipt controversy. It alleged only that Benuzzi had approached a student on March 16 (the day of the receipt incident) and stated, "Do you see how your principal acts? You shouldn't even go to this school. It's a disease." Benuzzi denied the allegations, which Watkins attributed to a note purportedly submitted by the student who had been on the bench at the time of Benuzzi

and Watkins' hallway dispute. Watkins recommended that Benuzzi serve another fifteen-day suspension. Benuzzi appealed to the Board, but the suspension was upheld.

On May 4, 2007, several custodians were absent. Watkins asked Benuzzi about the appropriate protocol to ensure that necessary tasks were still completed. Benuzzi outlined a plan and suggested that Watkins assign overtime to the custodians who would have to pick up the slack. Watkins claimed that no overtime funds were available and sent Benuzzi an email later that afternoon instructing her to have a custodian empty the garbage on the second floor before he left for the day. Benuzzi claims she did not receive the email; the custodian left without completing the requested task. According to Watkins, Benuzzi later approached her while she (Watkins) was emptying the trash on the second floor and offered to help. Watkins said, "Jessica, you do this all the time," to which Benuzzi loudly responded, "You lie, you lie, you lie." Benuzzi denies ever saying that and offers testimony from custodian Osceola Tines that she never heard a conversation "in which Ms. Watkins' truthfulness was called into question." Watkins detailed the incident in a Notice of Disciplinary Action, however, and later found the charges substantiated. Watkins recommended that Benuzzi serve a third fifteen-day unpaid suspension. Benuzzi appealed the suspension. Like the others, it was upheld. Benuzzi updated her EEOC charges on June 6.

The 2007-2008 and 2008-2009 school years were relatively uneventful compared to the 2006-2007 school year.

In July 2007, Benuzzi again asked Watkins if she could switch to the 6-2 shift. Watkins denied Benuzzi's request, though she eventually changed Benuzzi's hours in January 2009. In December 2007, the Board evaluated Pershing's cleanliness and awarded it a near-perfect score. In March, Benuzzi updated her EEOC charges again. Sometime during the summer of 2008, Watkins gave Benuzzi her first formal evaluation. (The defendants claim that a computer glitch listing Benuzzi as an employee of Douglas Academy prevented them from formally evaluating Benuzzi earlier.) Benuzzi scored 96.2/100 overall and received a 95 in "personal relations." On five occasions ranging from July 2008 to June 2009, Benuzzi asked Watkins to discipline custodian Tines for insubordination. Watkins investigated but never disciplined Tines. She emailed Benuzzi and said "[t]here is nothing to discuss regarding Ms. Tines. She has completed the work you asked her to do. . . . I stated this to you in previous meetings, it is the tone you take with certain members of the custodial staff that you could work to improve relations with your team."

In March 2009, the EEOC issued Benuzzi a right-to-sue letter. She filed suit against Watkins and the Board on June 9, 2009. In her complaint, she alleged that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by discriminating against her on the basis of her gender and race and by retaliating against her for filing charges with the EEOC. She also alleged that they violated the Equal Protection clause, U.S. Const. amend. XIV; 42 U.S.C. § 1983, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and the

Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.*
Three days after Benuzzi filed her complaint, Watkins
and Anderson conducted annual employee evaluations.
Benuzzi requested an evaluation, and Watkins refused
to give her one. Watkins also refused to give Benuzzi
a Pershing hat, which employees received along with
their evaluations.

A few days later, Watkins waived service of the com-
plaint. A few days after that, on June 23, she presented
Benuzzi with a cautionary notice (relating to the June 12
evaluation incident, of which the defendants provide
a markedly different account) and held out a pen so
Benuzzi could sign it. Benuzzi took the pen from Watkins'
hand and wrote "RTS," meaning "Refuses to Sign," on
the notice. Watkins allegedly felt threatened by the
manner in which Benuzzi took the pen and notice from
her, which she described as "snatching." She filed a
formal request with the Board to have Benuzzi removed
from the school because she feared for her safety. The
Board initially agreed to remove Benuzzi, but determined
the next day that Benuzzi's union contract prevented
such an action. There is no evidence indicating that
Benuzzi was aware of Watkins' request or the Board's
willingness to accede to it at the time.

Benuzzi initially sat for her deposition on December 17,
2009. Her testimony was cut short, however, when Watkins
had to leave to attend to a family emergency. Benuzzi
resumed and completed her deposition on February 25,
2010. Watkins was present. The next day, Watkins
issued Benuzzi a memorandum restricting her presence
at Pershing to the hours of 5:45 a.m. to 2:15 p.m., even

in the event of an emergency, unless she obtained permission from Watkins or the new assistant principal, Tamara King. Watkins also issued a lengthy Notice of Disciplinary Action that referenced nine separate incidents dating back to October 2009. The notice enumerated various transgressions, all of which Benuzzi disputes or denies entirely, such as failure to answer a walkie-talkie, failure to turn on the heat, failure to remove tables from the lunchroom, failure to complete agendas for custodial staff meetings, the falsification of information to discipline a subordinate, and the physical assault of custodian Armour. The most recent (and most serious) incident, the alleged assault of Armour, occurred on February 2, 2010, three weeks prior to the issuance of the notice.

After Watkins moved to dismiss the suit, Benuzzi conceded that all but her § 1983 claims against Watkins were coterminous with those naming the Board, in whose official capacity Watkins was undisputedly acting. Benuzzi consented to dismissal with prejudice of the non-§ 1983 claims against Watkins. Watkins and the Board then moved for summary judgment on Benuzzi's remaining claims. The district court granted their motion in full and later denied Benuzzi's Rule 59 motion for reconsideration. Benuzzi appeals only the grant of summary judgment on her Title VII gender discrimination and retaliation claims.

### III. Discussion

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must be able to show that a reasonable jury could return a verdict in her favor; if she is unable to "establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), summary judgment must be granted. We review de novo the district court's determination that the requirements of Rule 56(a) have been met. *Ellis v. CCA of Tenn. LLC*, ___ F.3d ___, No. 10-2768, 2011 WL 2247384, at *4 (7th Cir. June 9, 2011).

## A. Gender Discrimination

Benuzzi contends that the Board, acting through Watkins, discriminated against her on the basis of her gender. She relies exclusively on the indirect method, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 , 802 (1973), to argue that genuine issues of material fact preclude summary judgment for the defendants. To survive summary judgment under the indirect method, Benuzzi must first establish a prima facie case of discrimination by showing evidence of the following elements: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably than she. *Farr v. St. Francis Hosp. & Health Care Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009). If Benuzzi can make that showing, the Board must then provide a

nondiscriminatory reason for the employment action. If it does, the burden shifts back to Benuzzi, who must show that a jury could find that proffered reason is pretextual. *See id.* "Although intermediate burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quotation omitted)).

Benuzzi argues that the district court erred in its evaluation of the latter three elements of the prima facie case. She contends that her "outstanding" 2007-2008 evaluation, coupled with the Board's two glowing reviews of Pershing's cleanliness, establishes that she was meeting the Board's legitimate expectations. She also argues that Watkins' failure to evaluate her as regularly as required by the Illinois School Code, 105 Ill. Comp. Stat. 5/34-8.1, "preclude[s] her from disputing that Plaintiff met the Defendants' legitimate performance expectations," and, moreover, that Watkins' asserted reasons for suspending her were false and pretextual. Benuzzi claims that pretext is also suggested by the Board's appeals process. Benuzzi next avers that the district court inappropriately confined its analysis of adverse employment actions to her suspensions, which in her view are a mere portion of a discriminatory "course of action." Finally, she challenges the district court's

determination that she failed to identify a better-treated comparator. The district court found that Benuzzi's status as a supervisor and her failure to identify any coworkers who engaged in similar conduct without being similarly disciplined precluded her from satisfying this element. Benuzzi asserts that Vaughn and other Grade II engineers are comparable to Grade V-II engineers. She further asserts that she never engaged in inappropriate conduct and that even if she did, the record establishes that Vaughn engaged in similar conduct.

We need not get bogged down by most of these arguments. "The prima facie case and pretext inquiries often overlap; we may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007); *see also Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010). The defendants offered facially nondiscriminatory reasons for Benuzzi's three suspensions, the only relevant employment decisions for purposes of Benuzzi's discrimination claim. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). Benuzzi would prefer that we broaden the scope of our review to include, essentially, the "cumulative effect of individual acts," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), or, as she calls it, Watkins' "course of action" against her, but she has raised a discrimination claim, not a hostile work environment one, *see Vance v. Ball State Univ.*, ___ F.3d ___, No. 08-3568, 2011 WL 2162900 at *4 (7th

Cir. June 3, 2011). Moreover, she has failed to demonstrate that those actions, namely the cautionary notices and disfavored scheduling, had any tangible job consequences such that they constitute independent bases of liability under Title VII. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("At the very least, [plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference."); *see also Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions."); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) ("Lau's decision to change Grube's working hours certainly does not rise to the level of an adverse employment action. Grube's pay and job title remained the same, and she suffered no significantly diminished job responsibilities.").

The question before us therefore becomes whether a reasonable jury could conclude that the Board's asserted reasons for suspending Benuzzi were pretextual. To show pretext, Benuzzi must show not only that the Board's stated reasons for suspending her were dishonest or phony, but also that the true reason was based on prohibited discriminatory animus. *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009). She "must do more than simply allege that an employer's stated reasons are inaccurate; [s]he must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *Id.* This is where her discrimination claim falters. No reasonable jury could find that

Benuzzi has made the requisite showing of gender-based discriminatory animus. Even if we assume that Watkins cut her accounts of every incident for which she disciplined Benuzzi from whole cloth, which is essentially what Benuzzi contends, there is nothing in the record that so much as hints that she did so because of Benuzzi's gender. It is clear even from the cold record that Benuzzi and Watkins harbored a heated dislike for one another, but Benuzzi has not presented evidence supporting the inference that Watkins' antipathy toward her stemmed from her sex. *Cf. Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability."). And to the extent that the hearing officer's evaluation of her appeals is relevant, Benuzzi testified expressly that she had no basis from which to conclude that his rulings were influenced in any way by her gender. Without some semblance of a link between her gender and the adverse employment actions she experienced, Benuzzi's discrimination claim is destined to fail. The district court correctly granted summary judgment in the defendants' favor.

## B. Retaliation

Benuzzi also contends that the Board, again through Watkins, impermissibly retaliated against her after she filed (and continually updated) charges of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-3(a). She further claims that she experienced retaliation in connection with her prosecution of this related lawsuit. She points specifically to her receipt of a cautionary notice less than

a week after Watkins waived service of the complaint and a lengthy Notice of Disciplinary Action the day after she gave her deposition. Benuzzi did not seek to amend her complaint to include these latter incidents, but plaintiffs in federal court are not required to plead with precision legal theories or detailed facts. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) (finding waiver inappropriate even though retaliation plaintiff failed to plead "participation clause" of Title VII's anti-retaliation provision). In any event, neither the defendants nor the district court sought to prohibit Benuzzi from relying on these new facts, which she presented for the first time in the statement of additional facts accompanying her summary judgment response. To the contrary, the only four paragraphs of her statement that the district court explicitly considered were the paragraphs presenting these very facts, which the district court directly addressed near the conclusion of its order and opinion. *See Benuzzi*, 2010 WL 2169488, at *9. We likewise consider these litigation-related facts in our evaluation of Benuzzi's retaliation claim.

As with her discrimination claims, Benuzzi may prove her Title VII retaliation claims by using either the direct or indirect methods. *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). Benuzzi attempts to make her case under both methods. We need only look to her showing under the direct method, however, to conclude that she has presented sufficient evidence of retaliation to proceed to trial.

To avoid summary judgment on a retaliation claim under the direct method, Benuzzi must produce evi-

dence from which a jury could conclude: "(1) that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Id.* There is no real dispute that Benuzzi has satisfied the first element. Filing charges with the EEOC and pursuing a lawsuit in an attempt to vindicate those charges are "the most obvious form[s] of statutorily protected activity." *Id.*

The next query is whether Benuzzi has demonstrated that she suffered a materially adverse action as a consequence of her protected behavior. "Materially adverse actions" are those that might dissuade a reasonable employee from engaging in protected activity, *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); this category sweeps more broadly than the "adverse employment actions" required to sustain a discrimination claim, *see Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011). Benuzzi's suspensions without pay, the second of which she alleges was retaliatory, undoubtedly satisfy the materially adverse standard. *See, e.g., Ellis*, 2011 WL 2247384, at *7 ("There is no question that the suspension could qualify as an adverse employment action."). Equally clear is that Watkins' request to have Benuzzi removed from Pershing (which Benuzzi characterizes as a "demotion") does not. Benuzzi was never in fact removed or demoted, even temporarily; an empty threat that quickly dissipates before the employee becomes aware of it does not constitute a materially adverse action.

Whether the Notice of Disciplinary Action and hours restriction memorandum she received the day after she

gave her deposition were materially adverse present much closer questions that will be best resolved by a jury. Generally, written warnings, standing alone, do not constitute materially adverse actions, *see Lloyd*, 552 F.3d at 602; *Johnson*, 325 F.3d at 902.; the post-complaint cautionary notice does not trouble us. But context is a crucial consideration in Title VII retaliation actions, *Burlington*, 548 U.S. at 69, and in this context, we agree with Benuzzi that the sweeping Notice of Disciplinary Action citing petty misdeeds that allegedly occurred months ago, coupled with the unexplained memorandum restricting her access to Pershing, "could constitute an adverse action within the meaning of the direct method of proving retaliation," *Silverman*, 637 F.3d at 741. A reasonable employee could be deterred from filing a discrimination complaint or participating in a deposition if doing so would be followed by the (highly probable) possibility of discipline for activities he may have long forgotten and the limitation of his ability to be present at his workplace without first obtaining permission from his boss. *Cf. Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 420 (7th Cir. 2004) ("Lang's evidence raises the inference that Beckelman was setting him up to fail . . . ."). We leave that question for a jury to assess in the first instance, since we also find that Benuzzi has presented evidence from which a jury could infer that her statutorily protected activities precipitated these actions.

Causality is typically one of the highest hurdles retaliation plaintiffs must clear. Plaintiffs often look to timing alone to make the jump, and Benuzzi is no exception. She contends that because her second suspension was

subsequent and relatively proximate to the filing of her first amended EEOC charge, the former must have caused the latter two months later. (She does not mention her third suspension, which came about two months after the second and preceded her next round of EEOC charges.) She makes the same contention with respect to her deposition and the omnibus Notice of Disciplinary Action and hours-restricting memo, which were separated by only a day.

"The closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). Indeed, adverse actions occasionally "come[ ] so close on the heels of a protected act that an inference of causation is sensible." *Id.* The incredibly short span of time separating Benuzzi's deposition, at which Watkins was present, from her receipt of two arguably adverse documents authored by Watkins might reasonably give rise to the inference that the events were linked. *See id.* (inference of causality reasonable where employee discharged immediately after handing his supervisor a note detailing allegations of discrimination); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (inference of causality reasonable where supervisor recommended termination the day after an employee made a protected statement and employee was terminated three days later); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (inference of causality reasonable when two to three days separated employee's protected statement and termination). "A jury, not a judge, should decide whether the inference is appropriate" here, *Loudermilk*, 636 F.3d at 315, at least with respect to the

events that occurred after Benuzzi's deposition, particularly because no alleged intervening events might reasonably have justified the reprimands, *see Davis v. Time Warner Cable of Se. Wis., L.P.*, ___ F.3d ___, No. 10-1423, 2011 WL 2611303, at *9 (7th Cir. July 5, 2011). The two-month time frame separating Benuzzi's first amended EEOC complaint and her second suspension is, without more, insufficient to give rise to a similar inference. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval between [plaintiff's] sexual harassment complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day.").

## IV. Conclusion

Benuzzi has failed to demonstrate that the district court abused its discretion in handling her Local Rule 56.1 submission or erred in dismissing her gender discrimination complaint at the summary judgment stage. We AFFIRM those aspects of the district court's judgment. But there are genuine issues of material fact as to the adverse nature of the actions the defendants took against Benuzzi in the wake of her deposition, and whether those actions were causally linked to Benuzzi's participation in this case. We therefore VACATE the district court's grant of summary judgment on Benuzzi's retaliation claim and REMAND for trial.