NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 30, 2017[*]
Decided September 5, 2017

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

No. 16-4039

| | |
|---|---|
| HISHAM ABDEL-GHAFFAR, | Appeal from the United States |
| *Plaintiff-Appellant*, | District Court for the Northern District |
| | of Illinois, Eastern Division. |
| *v.* | |
| | No. 12 C 05812 |
| ILLINOIS TOOL WORKS INC., | |
| *Defendant-Appellee*. | Jeffrey T. Gilbert, |
| | *Magistrate Judge*. |

**O R D E R**

Hisham Abdel-Ghaffar was fired from his engineering job at Illinois Tool Works because, his boss said, his work and attitude were poor and had not improved after a warning. Abdel-Ghaffar, who was born in Egypt, then sued the company under Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981,

---

[*] The parties have asked that this appeal be decided without oral argument. See FED. R. APP. P. 34(a)(1), (f). We conclude that the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

claiming that his national origin and Muslim religion are the real reasons he was fired. A magistrate judge presiding by consent, see 28 U.S.C. § 636(c), granted summary judgment for the employer, prompting this appeal.

Illinois Tool Works ("ITW") hired Abdel-Ghaffar as a senior research engineer in early February 2011. He was tasked with managing the design of a "wireless welding network" for an ITW client and subsidiary, but within four months his supervisor, Kathy Downie, had started complaining about his performance. According to Downie, the first red flag was that, after she explained that he needed to include specific information in a presentation to the client (the pros and cons of different wireless networks, such as Wi-Fi, ZigBee, and Bluetooth), he did not do so, leading to a complaint from the client about the presentation. Downie responded to that complaint by demoting Abdel-Ghaffar and replacing him with a new team leader.

After his demotion, Downie says, Abdel-Ghaffar grew antagonistic toward the other members of the team. He repeatedly questioned the new team leader's ideas and debated small points, usually without data to support his views, causing delays in the team's work. Downie said this behavior caused her to question Abdel-Ghaffar's technical competence in addition to his attitude. On August 8, 2011, she gave Abdel-Ghaffar a performance-improvement plan with a "target" date of September 30 to develop his technical competence, his time-management skills, and his ability to work with others without being "stubborn and argumentative." Downie updated this performance plan on August 10 and again on August 23, the day before Abdel-Ghaffar began a ten-day vacation. She wrote in these updates that Abdel-Ghaffar had not improved, had become *more* insubordinate and argumentative, and had even been observed sleeping at work. Abdel-Ghaffar returned from vacation on September 13, and Downie fired him on September 16—seven months after she hired him.

At summary judgment ITW introduced a declaration from Downie explaining that she had decided to fire Abdel-Ghaffar on August 23 but waited to deliver the news until after his vacation. Abdel-Ghaffar contended, however, that Downie (like many Americans, he says) adopted a negative view of Egyptian Muslims after international media began reporting about a political uprising in Egypt in February 2011, which reached its peak days before he started at ITW. Three incidents, he said, prove Downie's hostility: First, on August 12, after telling coworkers he was fasting during Ramadan, Abdel-Ghaffar joined them for an event at a restaurant after work; when he arrived, Downie asked, "Why are you here? Aren't you supposed to be fasting?" Second, Abdel-Ghaffar thought Downie was visibly uncomfortable when he discussed events in

Egypt with an employee of ITW's client. Third, he thought she was angry when he disclosed his vacation plan—a religious pilgrimage to Mecca. In opposing summary judgment, Abdel-Ghaffar also disagreed with Downie's assessment of his performance and her implementation of the improvement plan.

In ruling for ITW, the magistrate judge analyzed the parties' submissions under both the direct and indirect methods of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). And while the court invoked our later-discarded "convincing mosaic" analogy in addressing the first of these methods, see *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the court also noted correctly that the "fundamental question" for both Title VII and § 1981 is whether a reasonable factfinder could infer discrimination from Downie's comments or her decisions to demote and ultimately fire Abdel-Ghaffar. See *id.*; see also *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir.) (explaining that Title VII and § 1981 use "essentially identical" analyses), *cert. denied*, 137 S. Ct. 82 (2016). The answer to this question is no, the court concluded.

The magistrate judge reached that conclusion after striking Abdel-Ghaffar's opposition to ITW's statement of material facts because his submission did not comply with Rule 56.1(b)(3) of the local rules for the Northern District of Illinois. The court faulted Abdel-Ghaffar, whose lawyer had by then withdrawn, for being wordy and for including "a significant amount of legal argument, conclusions, speculation, and purported factual statement unsupported by record citations." Yet, oddly, the court then "reviewed in detail" all of Abdel-Ghaffar's supporting evidence. This manner of proceeding rewarded, rather than penalized, Abdel-Ghaffar's disregard for the local rule, see *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (noting that enforcing Local Rule 56.1 allows district courts to *avoid* having to "scour the record" for relevant information), but the magistrate judge's benevolence also refutes Abdel-Ghaffar's first claim on appeal: that it was error to strike his opposition to ITW's statement of material facts. We followed the district court's lead and evaluated all of the parties' *admissible* evidence in the light most favorable to Abdel-Ghaffar. See *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016); see also *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 655 (7th Cir. 2011) (noting that court of appeals defers to district court's understanding of its own local rules). Abdel-Ghaffar's contention that the district court improperly struck his factual responses is meaningless in light of the district court's—and our—review of the entire record.

Abdel-Ghaffar next argues that the magistrate judge improperly ignored "direct evidence" of discrimination: Downie's comment about his fasting and her purported

discomfort upon hearing him discuss events in Egypt and his religious pilgrimage. The district court did not ignore this evidence; to the contrary, the court expressly concluded that while Downie's comments might have been "too flip, insensitive, or inappropriate," there was nothing "objectively disparaging or derogatory about them." We agree. "Stray remarks are generally insufficient to establish discriminatory motivation" unless made by the decisionmaker close in time and in connection with the adverse action. *Bagwe*, 811 F.3d at 885. Though Downie's fasting comment was made within weeks of her decision to fire Abdel-Ghaffar, it was made in a social setting and is too ambiguous to support an inference of discriminatory animus. See *id.*; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006). And Abdel-Ghaffar's conjecture that Downie was uncomfortable about his discussing the events in Egypt or his pilgrimage is not admissible to prove Downie had a negative attitude toward Egyptians or Muslims, which she denied in her declaration. See *Whitlock v. Brown*, 596 F.3d 406, 411–12 (7th Cir. 2010) (explaining that speculation is insufficient to survive summary judgment); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (same).

Abdel-Ghaffar also contends that a jury could conclude on this record that his performance was satisfactory and that Downie's explanation for firing him is pretextual. See *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (noting that when plaintiffs argue they have performed satisfactorily, question becomes "whether the employer is lying" about reasons for adverse action). Downie, the decisionmaker, gave several reasons in her declaration for firing Abdel-Ghaffar. Apart from his unsatisfactory presentation to the client and the concerns identified in the performance plan about his technical competence and ability to work with others, Downie also detailed instances of insubordination, *e.g.*, sending her e-mails berating her management decisions, taking unapproved leave, disregarding deadlines, and going over her head to reinstate a meeting she had cancelled.

Abdel-Ghaffar disputed some of these reasons—for example, at summary judgment he asserted that Downie set unreasonable expectations for him, that he performed adequately as project leader, and that the replacement proposal advanced by his successor eventually failed because his "nonsensical" suggestions actually were the correct solutions. But other than attempting to recharacterize or otherwise explain his actions, he does not contest Downie's descriptions of insubordination. That alone defeats his claim of pretext, since he loses unless a factfinder could disbelieve *each* of ITW's reasons for firing him. See *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015); *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 659 (7th Cir. 2009) (explaining that if "defendant has offered multiple nondiscriminatory reasons for its

hiring decision, showing that one of these reasons is pretextual is not enough" (internal quotation marks and citation omitted)). Moreover, even if Downie made poor decisions or mismanaged Abdel-Ghaffar, that would not prove that she *discriminated*. Courts are not concerned with whether an employer's reason for discharge was "inaccurate or unfair, but whether the employer honestly believed the reason it has offered." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). And though Abdel-Ghaffar spends a great deal of time trying to explain or recharacterize his poor performance, he does not point to any evidence in the record suggesting that Downie used his incompetence as a "mask to hide unlawful discrimination." See *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).

Finally, Abdel-Ghaffar argues that the magistrate judge ignored that Downie had disregarded ITW's policies regarding performance-improvement plans, which, he infers, means that she used the plan as a means to oust him. We have recognized that an employer's "departure from its own policies" may be evidence of discrimination, but we require "evidence of a specific policy that is regularly enforced and followed in similar situations." *Bagwe*, 811 F.3d at 882. Abdel-Ghaffar argues that ITW requires a longer time and regular follow-up when using improvement plans, but the documents he submitted (a PowerPoint presentation and handout about how to use such plans) do not establish any mandatory policies that Downie ignored.

Abdel-Ghaffar also points to Downie's e-mails that, he says, show her intent to fire him even before she instituted the improvement plan. Only two of these e-mails strike us as remotely relevant. Downie sent the first of those e-mails to the new project leader on August 3, 2011, several days *before* she imposed the performance-improvement plan. Responding to the new leader's complaints about Abdel-Ghaffar, Downie told him: "I am very saddened about [H]isham and angry with myself because I hired him. I'm going to talk with HR tomorrow and maybe we can accelerate my plan along for that problem." In a second e-mail to HR staff on August 14, six days after implementing the improvement plan, Downie attached an update to the plan and said she was sending it "now to see if we have enough documentation for decision point or if I need to do more, and what 'more' looks like." Although it might seem troubling that Downie fired Abdel-Ghaffar on September 16, two weeks before the "target improvement date" she had given him, those same e-mails show that she sped things along not because of any prohibited factor, but because of her growing concern about Abdel-Ghaffar's incompetence and "lack of understanding of basic engineering principles." Additionally, her update on August 23 describes disrespectful e-mails he sent her, missed deadlines, failure to keep regular hours, and sleeping on the job—all

*after* she gave Abdel-Ghaffar the performance plan. Each of these uncontradicted reasons support his discharge. See *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (concluding that complaints about plaintiff's work supported termination); *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) (noting that insubordination is legitimate reason for firing).

To this Abdel-Ghaffar responds that he might have been able to undercut Downie's explanations for her actions if the magistrate judge had not blocked him from deposing witnesses by telephone or videoconference. Abdel-Ghaffar had moved out of state for a new job before he sued, and his lawyer, before withdrawing, had secured ITW's agreement to conduct ten depositions, at least three of them by videoconference. The magistrate judge had endorsed the parties' agreement. After his lawyer withdrew, Abdel-Ghaffar contacted ITW's counsel about conducting depositions remotely, and even lowered the total number of people he would like to depose to five. Federal Rule of Civil Procedure 30(b)(4) allows depositions by "remote means" either on the stipulation of the parties, or on motion. ITW did not object to Abdel-Ghaffar's plan, but when he presented it in the form of a request to the magistrate judge—who on several occasions allowed him to appear telephonically for court hearings—he was told no. That denial meant that Abdel-Ghaffar never had an opportunity to investigate ITW's declarations or other evidence through depositions, since travel to Illinois was burdensome for him.

"District courts have broad discretion in supervising discovery," and ordinarily we do not question the exercise of that discretion. *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012). Here the court's decision concerns us. The magistrate judge said that deposing a witness by telephone or videoconference is "difficult" and "cumbersome" even for lawyers, and thus, despite ITW's agreement to participate in depositions by remote means, the judge refused to let Abdel-Ghaffar proceed. The court did allow Abdel-Ghaffar to take written depositions, which the magistrate judge also described as problematic. These reasons are dubious, particularly given the lack of objection from ITW and Abdel-Ghaffar's high level of litigation ability. Still, there is no reason to reverse. Abdel-Ghaffar insists that Downie and other witnesses "lied," but he does not explain how conducting the depositions would have enabled him to uncover any *specific facts* helpful to his case. See *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 679 (7th Cir 2002) ("[W]e shall not disturb a trial judge's exercise of discretion 'unless it is established that the denial of the requested discovery would result in actual and substantial prejudice to the complaining litigant.'").

We have considered Abdel-Ghaffar's additional arguments and none has merit. Accordingly, the judgment of the district court is

AFFIRMED.