In the

# United States Court of Appeals
### For the Seventh Circuit

No. 14-3201

RATNA BAGWE,

*Plaintiff-Appellant,*

*v.*

SEDGWICK CLAIMS MANAGEMENT
SERVICES, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-02450 — **Young B. Kim**, *Magistrate Judge.*

ARGUED SEPTEMBER 10, 2015 — DECIDED JANUARY 26, 2016

Before FLAUM, RIPPLE, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Ratna Bagwe, who was born in India
and is of Indian descent, brought this action in the United
States District Court for the Northern District of Illinois

against Sedgwick Claims Management Services, Inc. ("Sedgwick") and her former supervisors, Tammy LeClaire[1] and Angela Papaioannou. Alleging claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1, she stated that Sedgwick had paid her a comparatively low salary because of her race and national origin. She also alleged that she was terminated for retaliatory and racially discriminatory reasons. The district court granted summary judgment to the defendants on all counts. Ms. Bagwe now seeks reversal of that judgment.[2] For the reasons set forth in this opinion, we affirm.

# I

# BACKGROUND

### A. Facts

Because the district court entered summary judgment for the defendants, we must view the facts in the light most favorable to Ms. Bagwe, the nonmoving party. *See, e.g., Gerhartz v. Richert*, 779 F.3d 682, 685 (7th Cir. 2015).

Sedgwick is a claims management services company headquartered in Memphis, Tennessee. Ms. Bagwe began

---

[1] The defendants note that Tammy LeClaire is now known by the name Tammy Worthey. Both the filings and the record refer to Ms. LeClaire, so we will use this name for ease of reading.

[2] Pursuant to 28 U.S.C. § 636(c)(1), the parties consented to a federal magistrate judge's conducting all proceedings including final judgment. Accordingly, we refer to the magistrate judge as the district court throughout this opinion.

working in Sedgwick's Chicago office in March 2001. She was promoted to Assistant Manager II in 2005, and received a corresponding pay raise. She was then asked to serve as Interim Operations Manager in 2007. In late 2007, Ms. Bagwe was promoted to Operations Manager III. Ms. LeClaire, a Managing Director at Sedgwick, made the decision to promote Ms. Bagwe. Delaine Simmons, Ms. Bagwe's direct supervisor at the time, counseled Ms. LeClaire against promoting Ms. Bagwe. In Ms. Simmons's view, Ms. Bagwe had demonstrated poor leadership skills and had not provided sufficient direction to her subordinates.

As Operations Manager III, Ms. Bagwe oversaw short term disability claims for Sedgwick's AT&T account. Ms. Papaioannou, the Area Manager for the AT&T account, was her direct supervisor.[3] At the time of her promotion, Ms. Bagwe

---

[3] At this stage, it will be helpful to summarize the organizational structure of Sedgwick in the years Ms. Bagwe served as Operations Manager III.

Ratna Bagwe reported to Angela Papaioannou, Area Manager for the AT&T account. Ms. Papaioannou reported to Tammy LeClaire, Managing Director. Ms. LeClaire reported to Brad Johnson, the Executive Vice President.

Charles French, the AT&T Workers' Compensation Account Executive, was on the same grade level as Ms. Bagwe. Mr. French reported directly to Ms. LeClaire.

Within Colleague Resources, Carla Street worked as a Colleague Resources Manager in Sedgwick's Chicago office. She reported to Stephanie Simpson, Regional Colleague Resources Manager. Ms. Simpson reported to Rachel Jackson, Senior Vice President of Colleague Resources. Terri Browne, Executive Vice President and Chief People Officer, oversaw Colleague Resources.

received a promotional pay raise of $10,000. She received another pay raise of $3,000, sometime in 2008.[4]

Ms. Bagwe did have some managerial problems as Operations Manager III. In early 2008, one of Ms. Bagwe's subordinates, Tonya Warner, requested that Ms. Papaioannou reassign her to a different supervisor. Ms. Warner claimed that Ms. Bagwe had failed to provide her with important information and was overly confrontational. Ms. Papaioannou and Ms. LeClaire considered the complaints and decided to reassign Ms. Warner so that she reported to Ms. Papaioannou instead of Ms. Bagwe.

Ms. Bagwe was also dissatisfied with her compensation. During an April 2008 conference call with Ms. Papaioannou and Carla Street, a Colleague Resources Manager, Ms. Bagwe expressed general concerns about her pay increases over the three previous years. Ms. Bagwe concedes that she did not mention race, national origin, or discrimination in the course of that conversation. Ms. Papaioannou allegedly warned Ms. Bagwe "that we have to be careful because we don't want to be perceived as a whiner."[5] Ms. Papaioannou later discussed Ms. Bagwe's complaints with Ms. Simmons in a series of text messages:

Ms. Papaioannou: tried to tell [Ms. Bagwe] yesterday

---

[4] Ms. LeClaire explained that an employee's direct supervisor would recommend salary increases and that she then would review those recommendations. R.163-2 at 27 (47:10–19). After Ms. LeClaire gave her approval, the recommendations went to Terri Browne, Executive Vice President and Chief People Officer; Jim Wiertelak, Chief Operating Officer, later made a final review.

[5] R.163-24 at 4.

> to be careful on the whole max 3% thing

> Ms. Papaioannou: apparently didn't not hear me

> Ms. Simmons: yes i know, she told me you did. i tried to talk her down as well. she really has an overinflated sense of her importance

> Ms. Papaioannou: I am meeting with her again on Friday so I'm probably going to be direct with her again but if she continues, I'm not going to be able to stop [Ms. LeClaire][6]

Ms. Bagwe submitted a memorandum to Ms. Street a few days later, expressing similar concerns about her compensation. The memorandum was then forwarded to Ms. LeClaire. Like the earlier conference call, the memorandum did not mention race, national origin, or discrimination. Instead, Ms. Bagwe claimed that Ms. LeClaire had pressured Ms. Simmons, her direct supervisor before the promotion, to deny her a promotional increase in 2005. Ms. Bagwe also claimed that, sometime shortly after she sent this memorandum, Ms. LeClaire raised her voice to Ms. Bagwe and told her that "[you] think [you're] good but [you're] no good."[7]

Ms. LeClaire determined that Ms. Bagwe had received appropriate raises since 2005. In her affidavit, Ms. LeClaire stated that Ms. Simmons had recommended above-budget pay increases for Ms. Bagwe in 2003 and 2004. As a result, Ms. Bagwe's salary already was above the median salary of an Assistant Manager II. In addition, Ms. LeClaire determined

---

[6] R.163-23 at 2.

[7] R.163-1 at 6 (231:10–232:20).

that her subsequent pay raises were average for her peer group. Based on these observations, Ms. LeClaire concluded that Sedgwick need not take any further action regarding Ms. Bagwe's salary at that time.

Ms. Bagwe first raised the issue of racial discrimination in a May 2008 conversation with Stephanie Simpson, Regional Colleague Resources Manager. The record does not indicate whether Ms. Simpson actually reported this complaint to Ms. LeClaire or to Ms. Papaioannou, as required by Sedgwick's policies.

In June 2008, Ms. Bagwe took a business trip to Atlanta with Ms. LeClaire and another Sedgwick employee, Anne Coyle. One evening, at the bar of the hotel where they were staying, Ms. LeClaire began discussing her pending divorce with Ms. Bagwe and Ms. Coyle. During this conversation, Ms. LeClaire allegedly told Ms. Bagwe that she should get rid of her "old Indian husband" and get a "white man because white men are more fun."[8] Ms. Coyle made similar remarks.

About six months later, in January 2009, Ms. Bagwe and Ms. Coyle got into a heated exchange at work. Charles French, the AT&T Workers' Compensation Account Executive, overheard the conversation. He sent an email to Ms. Papaioannou on January 22, 2009, expressing his concerns about Ms. Bagwe's leadership and some other staffing issues on Ms. Bagwe's team. He then met with Ms. Bagwe and Ms. Street on February 10, 2009, to discuss the incident involving Ms. Coyle. At the meeting, Ms. Bagwe relayed Ms.

---

[8] R.145-15 at 48–49 (265:23–266:2).

LeClaire's and Ms. Coyle's comments about finding a "white husband." Ms. Bagwe also mentioned that Ms. Coyle previously had made a hand gesture to make fun of a co-worker's sexual orientation. Following this meeting, Ms. Bagwe repeated the information to Ms. Papaioannou.

Mr. French later sent a memorandum to Ms. Street and Ms. Papaioannou, expressing his concerns about Ms. Bagwe's leadership. The memorandum mentioned the altercation between Ms. Bagwe and Ms. Coyle, a series of emails from Ms. Bagwe in which she questioned a final decision that she had previously approved during an earlier meeting, and a failure by Ms. Bagwe's team to share reports with others in the company.[9]

In March 2009, Sedgwick placed Ms. Bagwe on a Performance Improvement Plan ("PIP"). The PIP cited several criticisms of Ms. Bagwe's behavior over the prior year, notably that she had not brought any solutions to the February meeting with Mr. French, that she had been unresponsive to emails, and that she refused to listen to criticism. The PIP also mentioned Ms. Bagwe's complaints about Ms. Coyle's comments, noting "that if you overheard comments being made by another colleague about someone else, it was your role and responsibility to address the issue at that time and not a year later."[10] Ms. LeClaire and Ms. Papaioannou presented the PIP to Ms. Bagwe in a meeting on March 12, 2009. During this meeting, Ms. LeClaire allegedly pointed her finger at

---

[9] R.145-9 at 45–48.

[10] R.145-18 at 30.

Ms. Bagwe and warned her that she "better be careful."[11]

In April 2009, Ms. Bagwe complained about the PIP to Ms. Papaioannou, Ms. LeClaire, Ms. Street, and Ms. Simpson. She also sent a complaint to Ms. Simpson in which she described "discrimination, harassment, bullying, and hostile work environment."[12] The latter complaint mentioned "disparities in salaries for some of [the] other colleagues," and Ms. Le-Claire's "retaliation" for Ms. Bagwe's previous complaints.[13] Ms. Simpson forwarded this complaint to Ms. Browne and Rachel Jackson, the Senior Vice President of Colleague Resources.

Ms. Simpson then investigated the complaint and issued a report on June 15, 2009. The report discussed Ms. Bagwe's complaints about her work environment and set forth her coworkers' perspective of the situation. According to the report, Ms. Warner noted "a perception [that Ms. Bagwe] is retaliatory."[14] Mr. French felt "like [Ms. Bagwe] is the one attacking him."[15] One coworker said that Ms. Bagwe "would talk over her and it was her natural instinct to raise her

---

[11] R.163-1 at 36 (777:3–20). In her appellate brief, Ms. Bagwe claims that Ms. LeClaire also told her "that she better not tell anyone about a fabricated write-up." Appellant's Br. 7–8. However, Ms. Bagwe stated in her deposition that "the threatening was about you better be careful…and *not* like you better not tell anyone." R.163-1 at 36 (777:9–14) (emphasis added).

[12] R.163-30 at 3.

[13] *Id.*

[14] R.145-11 at 32.

[15] *Id.* at 33.

voice."[16] Another co-worker observed that "it was very difficult to get the benefit of the doubt from [Ms. Bagwe] or change her perception to be favorable."[17] The report also concluded that Ms. Bagwe was compensated fairly, considering her level of experience.[18]

On June 22, 2009, Ms. Bagwe sent Ms. Simpson another e-mail about her concerns, stating that "[i]f discrimination is not the reason, please help me understand why my repeated requests to have the compensation addressed based solely on the merits of the situation have not been considered[.]"[19] Ms. Simpson sent Ms. Bagwe a letter on July 28, 2009, stating that "[w]e were unable to obtain tangible evidence or additional witness[es] to confirm that harassment and/or discrimination occurred," and that "we analyzed your pay and determined that your compensation is fair."[20]

At some point around early July, after a lunch outside the office, Ms. Bagwe asked Ms. LeClaire how her sister-in-law was doing. According to Ms. Bagwe, Ms. LeClaire responded, "which one, the Indian?"[21] Ms. LeClaire then said that she did not like her sister-in-law.[22]

---

[16] *Id.* at 34.

[17] *Id.*

[18] *Id.* at 37.

[19] *Id.* at 40.

[20] *Id.* at 48.

[21] R.145-15 at 56 (273:6–8).

[22] *Id.*

In July of 2009, Ms. Warner canceled a meeting and ignored Ms. Bagwe when confronted about the cancellation. Ms. Bagwe then sent Ms. Warner a series of heated emails, which left Ms. Warner in tears. Ms. Warner forwarded these emails to Ms. LeClaire. Ms. LeClaire expressed concern about the confrontational tone of the emails, and subsequently met with Ms. Papaioannou to discuss the matter. Ms. Papaioannou stated in her deposition that she felt that Ms. Bagwe "handled the situation appropriately."[23] However, Ms. Papaioannou said she also received complaints from other coworkers about "email war debates" started by Ms. Bagwe.[24]

At some point in late July or early August 2009, Sedgwick decided to terminate Ms. Bagwe. Ms. LeClaire, Ms. Papaioannou, Ms. Browne, and Brad Johnson, Executive Vice President of Sedgwick, were involved in the decision. Sedgwick's policies required that Ms. Browne or Ms. Jackson approve any termination.[25] The decisionmakers all stated that Ms. Browne approved Ms. Bagwe's termination. However, each gave differing accounts of how the company reached the decision to terminate. Ms. Papaioannou said that the decision was reached during a conference call between her, Ms. LeClaire, Ms. Browne, and Mr. Johnson.[26] Ms. LeClaire said that she and Ms. Papaioannou reached the decision, and she then

---

[23] R.145-8 at 18 (191:24–192:5).

[24] *Id.* at 17 (185:21–186:11).

[25] R.163-8 at 3 (50:18–21).

[26] R.163-3 at 2 (9:13–25).

spoke directly to Ms. Browne.[27] Ms. Browne said that she received a recommendation to terminate from Mr. Johnson, and never spoke to Ms. LeClaire.[28] Mr. Johnson testified that he spoke to Ms. LeClaire, and then communicated Ms. LeClaire's recommendation to Ms. Browne.[29]

On August 13, 2009, Ms. Bagwe stopped by Ms. Papaioannou's office to say hello. Ms. Bagwe claims that, as she was leaving, she heard Ms. Papaioannou call her an "Indian bitch."[30] Ms. Papaioannou disputes that she ever made this comment, but we must accept Ms. Bagwe's testimony as true on review of a grant of summary judgment.

Later that day, Ms. Bagwe learned from Ms. Street and Ms. Jackson that she was terminated. Ms. Jackson explained that there was a "continuing lack of trust" that had "become a distraction to the business."[31] Ms. Jackson and Ms. Street also made clear that the termination had "nothing to do with performance."[32] Following her termination, Ms. Bagwe was escorted directly out of the building.

Sedgwick had used a "Termination Checklist and Ques-

---

[27] R.163-2 at 11 (203:13–204:13).

[28] R.163-5 at 8 (49:23–52:1).

[29] R.163-4 at 7 (67:1–68:25).

[30] R.163-1 at 22–23 (581:8–582:9).

[31] R.163-66 at 2.

[32] R.163-1 at 32 (713:10–24).

tionnaire" on previous occasions. The form included a number of yes or no questions and ended with an instruction to "[a]llow the colleague to say goodbye to co-workers and to gather belongings; then escort quietly from the premises."[33] The checklist was not filled out during Ms. Bagwe's termination. Ms. Street described the checklist as a "routine thing."[34] However, Ms. Jackson stated that "[a]ny time I go [to the termination meeting], for the most part, a termination checklist is not involved, because those termination checklists come to me to review."[35] At least two other employees were terminated without the use of this checklist.

In February 2010, Sedgwick hired a replacement for the Operations Manager III position. Ms. Bagwe's replacement was white and American. He did not have experience with disability claims, but he did have management experience that Ms. Bagwe lacked. He also started at a higher salary than Ms. Bagwe. Ms. Papaioannou could not remember why Sedgwick started him at a higher salary, but Ms. LeClaire explained that it was based on "his level of experience and years of management."[36] Ms. Bagwe's replacement failed to learn the aspects of claim management, and settled a workers' compensation claim without proper authority.[37] After being coun-

---

[33] R.163-19 at 4–6.

[34] R.163-8 at 4 (70:15–16).

[35] R.163-7 at 12 (85:7–9); *see also* R.163-5 at 7 (41:11–12) (Ms. Browne stating that the checklist is not used in every situation).

[36] R.170 at 2 (104:12–19).

[37] R.145-5 at 58 (119:13–120:23).

seled by Ms. Papaioannou for about one year, he was terminated on September 21, 2012.

A few months after her termination from Sedgwick, Ms. Bagwe applied for a position with Matrix Absence Management. Ms. Bagwe was denied the position. Ms. Bagwe has submitted the affidavit of a former employee at Matrix, who states that:

> Prior to the time I could schedule Ms. Bagwe's trip with the recruiter, I received an e-mail from [the CEO of Matrix]. The e-mail indicated [that the CEO] had just spoken with someone he knew from working at Sedgwick and that, based on that, I should not hire Ms. Bagwe. It said [that the CEO] learned that Ms. Bagwe was a good performer before she was promoted, but that then she became a "problem." The e-mail did not provide any specifics about Ms. Bagwe's performance after her promotion, only that she was a "problem." The e-mail specifically said "Do not hire her."[38]

The Matrix employee further related that, upon receiving this email, she terminated the hiring process.

**B. Earlier Proceedings**

Ms. Bagwe filed timely charges of discrimination, hostile work environment, harassment, and retaliation with the Equal Employment Opportunity Commission ("EEOC") on

---

[38] R.163-59 at 3–4.

December 12, 2009. She later filed this action in district court against Sedgwick, Ms. LeClaire, and Ms. Papaioannou on April 12, 2011. The complaint included discrimination, retaliation, and defamation claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000e, the IHRA, and state common law.

On May 1, 2014, the defendants filed a motion for summary judgment on all counts. The defendants argued that Ms. Bagwe's claims of pay discrimination were barred by the applicable statutes of limitations and that all of the claims fell short on the merits. Ms. Bagwe did not respond to the defendants' argument that certain pay discrimination claims were time-barred. Ms. Bagwe did contest, however, the defendants' merits arguments about the discrimination and retaliation claims. She withdrew her defamation claim.

On September 5, 2014, the district court granted summary judgment in favor of Sedgwick, Ms. LeClaire, and Ms. Papaioannou on all of Ms. Bagwe's claims. It concluded that Ms. Bagwe's claims of pay discrimination were untimely, and therefore it did not consider these claims on the merits. The district court further concluded that Ms. Bagwe's remaining claims of discrimination and retaliation failed on the merits.

## II

### DISCUSSION

We review de novo a district court's grant of summary judgment. *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). Summary judgment is appropriate when, after construing the record in the light most favorable to the nonmoving party, we conclude that no reasonable jury could rule in favor of the

nonmoving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## A. Discrimination Claim Based on Termination

Ms. Bagwe first contends that Sedgwick terminated her on the basis of race and national origin. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 makes it unlawful for an employer to discriminate on the basis of race or national origin when "mak[ing] and enforc[ing] contracts." 42 U.S.C. § 1981. The IHRA makes it unlawful "[f]or any employer…to act with respect to…privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2-102(A).

A plaintiff may prove discrimination under Title VII, Section 1981, and the IHRA either directly or indirectly.[39] A plaintiff proceeds under the direct method of proof by showing "either direct or circumstantial evidence of intentional racial

---

[39] The analytical framework for all three statutes is "essentially identical," and therefore we need not analyze them separately. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012) (discussing Title VII and § 1981); *Zaderaka v. Illinois Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (discussing Title VII and the IHRA). We therefore accept Ms. Bagwe's contention that the claims should be assessed under the same framework. Appellant's Br. 23–24; *see also Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 754 (7th Cir. 2014) (resolving a Title VII and IHRA claim at the same time because the plaintiff "conceded that the merits of his state-law discrimination claim would rise or fall with the merits of the federal claim").

discrimination." *Tank v. T-Mobile, USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014). Direct evidence includes actual admission of discriminatory intent. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). Circumstantial evidence includes:

> (1) a mosaic of evidence which, taken together, would permit a jury to infer discriminatory intent; (2) comparative evidence showing that employees similarly situated to the plaintiff other than in the protected characteristic received systematically better treatment; and (3) pretext evidence, where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief.

*Piraino v. Int'l Orientation Res., Inc.*, 84 F.3d 270, 274 (7th Cir. 1996); *see also Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). We do not employ "some kind of esoteric 'mosaic test' or theory" under the direct method of proof. *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). The circumstantial evidence, taken together, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). "[A]n overload of irrelevant or nonprobative facts," will not "add up to relevant evidence of discriminatory intent. … [Z]ero plus zero is zero." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001). Similarly, a single piece of circumstantial evidence, without more, will not support a case of illegal discrimination. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).

Under the indirect method of proof, a plaintiff employs the test articulated in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). A plaintiff has the initial burden to show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). If a plaintiff establishes a prima facie case, the burden shifts to the defendants to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

Ms. Bagwe has not specified whether she is proceeding under the direct or indirect method of proof, but instead criticizes the entire framework as too rigid. We previously recognized that "serious questions" have been raised about this framework, but "[a]s long as the Supreme Court's precedents in this area are still good law, we're not authorized to abandon the established framework." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905–06 (7th Cir. 2015) (quoting *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789–90 (7th Cir. 2015)). We emphasize that "all relevant direct *and* circumstantial evidence is considered (in its 'totality') in *both* methods," but that "we do indeed consider the 'direct' and 'indirect' methods separately when reviewing summary judgment." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (emphases in original).

When "a plaintiff eschews burden-shifting and presents direct and circumstantial evidence in opposition to an employer's motion for summary judgment," we typically use the direct method as the "default rule." *Morgan*, 724 F.3d at 997.

Here, the district court elected to review the evidence under both methods of proof; therefore, for the sake of completeness, we also will evaluate the evidence under both the direct and indirect methods.

### 1.  Direct Method

Ms. Bagwe submits that there is sufficient circumstantial evidence to permit a jury to conclude reasonably that she was terminated on the basis of race and national origin. In her view, the record contains "pretext" evidence, comparative evidence, and evidence of remarks that suggest a discriminatory motive. We will consider each of these types of evidence in turn, and then determine whether the record, taken as a whole, "point[s] directly to a discriminatory reason for the employer's action." *Adams*, 324 F.3d at 939.

### a.

Ms. Bagwe first contends there is evidence which suggests that Sedgwick's alleged rationale for termination—that Ms. Bagwe demonstrated poor leadership skills—is "unworthy of belief." *Piraino*, 84 F.3d at 274. To meet this burden, Ms. Bagwe must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Sedgwick's rationale "that a reasonable person could find [it] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Ms. Bagwe has not met that burden here. By the time Ms. Bagwe was terminated, Sedgwick had received multiple

complaints about her inability to work with others. Indeed, the company earlier had placed Ms. Bagwe on a PIP because of such concerns. Later, at Ms. Bagwe's termination, Ms. Jackson explained that there was a "continuing lack of trust" and noted particularly the "continuing excessive emails."[40] Ms. LeClaire observed that "morale was low in the office" as a result of Ms. Bagwe's leadership.[41] Ms. Papaioannou noted the "[e]mail communication" and that "[p]ersonal relationships with office colleagues are lacking."[42]

Ms. Bagwe nevertheless argues that Sedgwick has given "shifting" explanations for her termination, which calls this rationale into question. Where decisionmakers' stated rationales are "sufficiently inconsistent or otherwise suspect," a summary judgment cannot stand. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013). However, these "explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003); *see also O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997) (holding that a letter which described "insubordinate activities on your part which you were previously advised to cease" did not conflict with a letter which described "the continued harassment of an employee … after you were advised to cease"). Here, the decisionmakers' explanations that Ms. Bagwe identifies are entirely consistent and supported by the record. Ms. Street and

---

[40] R.163-66 at 2.

[41] R.145-5 at 39 (204:4–5).

[42] R.163-45 at 2.

Ms. Jackson told Ms. Bagwe that her termination had "nothing to do with performance,"[43] which is in keeping with Sedgwick's assertions that Ms. Bagwe was fired for interpersonal reasons. Sedgwick stated in its EEOC statement that Ms. Bagwe "was interfering with everyone's ability to do their job and service their clients satisfactorily,"[44] which is not inconsistent with Sedgwick's admission that Ms. Bagwe never had an impact on the company's bottom line. As Ms. LeClaire explained in her deposition, the "metrics ha[d] been…met" under Ms. Bagwe's leadership,[45] but the company decided to terminate her because "morale was low in the office."[46] Contrary to Ms. Bagwe's suggestion, these semantic differences are not evidence of pretext. Ms. Bagwe may have met the company's goals, but she had done so in a manner that jeopardized the ability of those around her to do their job. A company can certainly insist on a management style that ensures a smooth operating atmosphere.

Ms. Bagwe also highlights the conflicting accounts from Sedgwick's decisionmakers over how and when the termination decision was reached. However, we have held that where "there is no conflict in the evidence regarding the reasons for" an adverse employment action, "differing recollections" of the events surrounding that action "do not raise a reasonable inference of discrimination." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 724 (7th Cir. 2008); *see also Schuster*, 327 F.3d at

---

[43] R.163-1 at 32 (713:10–24).

[44] R.163-11 at 3.

[45] R.145-5 at 33 (177:14–24).

[46] *Id.* at 39 (204:3–6).

579. Here, the decisionmakers at Sedgwick have provided a consistent *rationale* for Ms. Bagwe's termination: she demonstrated ineffective leadership skills. Their differing recollections over exactly who spoke with whom do not call that rationale into question.

Next, Ms. Bagwe points to a list of complaints a coworker provided to Ms. Papaioannou a few days after the decision to terminate was made. Ms. Papaioannou received this list in early August, a few days before Ms. Bagwe was actually terminated. She then emailed the list to Ms. Jackson. Ms. Bagwe contends that the list suggests that Ms. Papaioannou was trying to "dig up" reasons for her termination. When "evidence indicates an attempt to justify a discharge after the fact," it can suggest a discriminatory motive. *Futrell v. J.I. Case*, 38 F.3d 342, 349 (7th Cir. 1994) (finding potential discrimination where a decisionmaker created a list of deficiencies after a termination and then made "it seem as if he kept the notes contemporaneously"). However, there is no evidence in the record showing that Ms. Papaioannou solicited this list. More importantly, Ms. Papaioannou never has intimated that she relied on the list when recommending Ms. Bagwe's termination. This list, therefore, does not raise any inference of discrimination.

Ms. Bagwe also suggests that Sedgwick deviated from its internal procedures when it terminated her. An employer's departure from its own policies may be circumstantial evidence of discrimination. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005). However, there must be evidence of a specific policy that is regularly enforced and followed in similar situations. *Tank*, 758 F.3d at 806 (holding that there was not circumstantial evidence where plaintiff did not offer

any corporate policy); *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 353 (7th Cir. 2009) (holding there was not circumstantial evidence where the "policy permits the employer to exercise discretion"). In this case, Ms. Bagwe fails to present any regularly enforced company policy that Sedgwick failed to follow. Ms. Bagwe contends that Ms. Browne was obligated to speak with all of Ms. Bagwe's supervisors and review all documentation and that Ms. Papaioannou was obligated to attend her termination meeting. However, she does not point to any evidence of a company policy that imposed these obligations. Ms. Bagwe also contends that Sedgwick failed to complete the "Termination Checklist and Questionnaire" on the day of her termination and failed to follow the checklist's recommendation to allow an employee to return to her office after being fired. However, the record indicates that when Ms. Jackson, the Senior Vice President of Human Resources, attends a termination meeting, the checklist is not employed. *Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012) (holding that a deviation from company procedure was not suspicious because the company had explained that the procedure was not followed when a senior officer was involved).

Ms. Bagwe also argues that the decisionmakers knew that she got along with others and that this shows that their rationale was pretextual. First, she points to Ms. Street's testimony that she had attended meetings run by Ms. Bagwe and never had witnessed any communication issues.[47] However, Ms. Street was not a decisionmaker, and nothing in the record

---

[47] R.163-8 at 18–19 (107:17–108:12).

suggests that she conveyed that opinion to a decisionmaker.[48] Second, Ms. Bagwe claims that Ms. LeClaire was aware that she had handled appropriately her dispute with Ms. Warner. However, she does not provide any evidentiary support for that proposition.[49] Third, she points to Ms. Papaioannou's comments that, in June, Ms. Bagwe's relationships seemed to be improving and that she was satisfied with the way Ms. Bagwe handled the dispute with Ms. Warner. However, Ms. Papaioannou explained that her decision to terminate was based on the accusations of "email war debates" she learned about in July.[50] Finally, Ms. Bagwe contends that Ms. Simpson and Ms. LeClaire had "objective" evidence that she was a team player based on colleague survey results.[51] The survey results, however, only assessed management *teams*, not individual employees.[52] Sedgwick concluded, after receiving several emails and having numerous meetings with

---

[48] Further, Ms. Street testified that she attended these meetings "[s]ometimes. Not—not all the time." *Id.* at 18 (107:24).

[49] Ms. Bagwe relies on Ms. LeClaire's deposition for this proposition. Appellant's Br. 41 (quoting R.166 at 33). However, the material she cites has nothing to do with Ms. Warner. *See* R.166 at 33 (quoting R.163-2 at 3 (26:24–27:6)).

[50] R.145-8 at 17 (185:21–186:11).

[51] The Chicago AT&T management team, for which Ms. Bagwe was partially responsible, scored better than Sedgwick's Atlanta Disability Bell South team in categories such as "[m]y immediate supervisor listens to me," and "[i]n my department, communications are open and honest." *See* R.163-13 at 35–44. However, the Chicago team performed worse than the average Sedgwick management team in these same categories. *Id.*

[52] R.163-5 at 13 (84:17–21).

Ms. Bagwe, that her interpersonal issues were a problem for the company. The record does not suggest that Sedgwick's rationale was insincere or pretextual, and we do not sit as a "superpersonnel department[]" that judges the wisdom of Sedgwick's decisions. *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (internal quotation marks omitted).

Lastly, Ms. Bagwe contends that Sedgwick called a potential employer, Matrix Absence Management, and told them that she was "a problem."[53] Ms. Bagwe believes that this exchange proves that Sedgwick had an improper motive. However, she relies on the affidavit of a former Matrix employee, who heard the comment secondhand. "Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged … statement but was later told by another that the statement was made, such testimony is rejected as hearsay" on summary judgment. *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014).[54] Moreover, even

---

[53] R.163-59 at 3–4.

[54] Ms. Bagwe argues that the statement falls within the "present sense impression" exception to the hearsay rule. Fed. R. Evid. 803(1). To fall within this exception: "(1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter." *United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001). Ms. Bagwe provides no proof that Sedgwick's comment was immediately conveyed. Instead, she relies on the Matrix employee's assertion that her supervisor told her that the comment had "just" been made. That assertion also is based on hearsay, as it is using the supervisor's statement to prove the truth of the matter asserted. Therefore, the statement cannot

were we to consider the statement that was allegedly made in this phone call, Ms. Bagwe has not explained why the call would lead a jury to believe that Sedgwick had an ulterior motive. The statement does not mention race, retaliation, or anything improper. A Sedgwick employee could have made this statement for any variety of equally plausible reasons, including a legitimate concern about Ms. Bagwe's inability to get along with co-workers.[55] No jury could infer discriminatory intent from this call, or any of the other supposed "pretext" evidence.

### b.

Ms. Bagwe also contends that she has "comparative evidence showing that employees similarly situated to [her] other than in the protected characteristic received systemati-

---

fit the "present sense impression" exception to the hearsay rule. *Schindler v. Seiler*, 474 F.3d 1008, 1012 (7th Cir. 2007).

[55] It is not clear that a Sedgwick employee even made the call. First, it is unclear from the affidavit whether the Matrix supervisor made the call to the "Sedgwick employee" or whether the "Sedgwick employee" called the Matrix supervisor. *See* R.163-59. The affidavit does not specify, and it is difficult to see how someone from Sedgwick would have known to call Matrix about Ms. Bagwe sua sponte. Second, the Matrix supervisor allegedly said that he had "spoken with someone he knew from working at Sedgwick." *Id.* at 3. It is unclear whether that meant a current Sedgwick employee, a former Sedgwick employee, or someone who worked closely with Sedgwick employees. Third, this discussion assumes that the Matrix supervisor's statement is true, but that statement is hearsay. Ms. Bagwe has not presented an affidavit or deposition from the supervisor, or demonstrated that she is otherwise prepared to submit non-hearsay evidence.

cally better treatment." *Piraino*, 84 F.3d at 274. Although comparative evidence is traditionally assessed under the indirect method of proof, it can be relevant under the direct method as well. *Tank*, 758 F.3d at 808; *Coleman*, 667 F.3d at 861 n.9; *Hasan*, 552 F.3d at 529–30 n.4. To be similarly situated, an employee must be "directly comparable to [a plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Typically, we consider whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

Ms. Bagwe first compares herself to her replacement, who was a white American that also had leadership problems during his employment at Sedgwick. Ms. Bagwe's replacement also was terminated, which suggests he was not treated more favorably. However, Ms. Bagwe contends that he was fired for costing Sedgwick money. She believes that Sedgwick would have otherwise retained him, despite his leadership issues. Her belief is based entirely on speculation and does not constitute evidence of discrimination. *Winsley v. Cook Cty.*, 563 F.3d 598, 605 (7th Cir. 2009) (holding that an employee was not a valid comparator when she quit before any adverse action could be taken, and it was therefore "far from clear that [she] was treated more favorably").

Ms. Bagwe also contends that she was paid less than her colleagues who were white and American, which suggests that Sedgwick acted with a discriminatory motive. Her argument is primarily based on a chart comparing her salary to

other Operations Managers III. However, Ms. Bagwe has provided no further information about these employees. She has not explained whether these employees were subject to the same standards, subordinate to the same supervisors, or had comparable experience and qualifications. Ms. Bagwe cannot simply rely on the fact that these employees held the same title. *Tank*, 758 F.3d at 810; *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 590 (7th Cir. 2011). On the subject of pay, Ms. Bagwe only identifies one employee with any specificity: her replacement. However, he had additional operations management experience when he was hired, and received a higher salary based on that experience.[56] Therefore, he is not similarly situated to her on the issue of compensation. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004).

### c.

Finally, Ms. Bagwe contends that there is "evidence of discriminatory intent" that would lead a reasonable jury to find in her favor. Specifically, she points to Ms. LeClaire's remark about her sister-in-law, Ms. LeClaire's suggestion to get rid of Ms. Bagwe's "old Indian husband," and Ms. Papaioannou's comment referring to Ms. Bagwe as an "Indian bitch."

Remarks can raise an inference of discrimination when they are "(1) made by the decision-maker,[57] (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602

---

[56] R.170 at 2 (104:12–19).

[57] The parties agree that Ms. Papaioannou and Ms. LeClaire were decisionmakers.

F.3d 845, 850 (7th Cir. 2010). When considering whether a re-
mark is discriminatory, we also consider the context in which
the remark was made. *Oest v. Illinois Dep't of Corrs.*, 240 F.3d
605, 611 (7th Cir. 2001) (explaining that comments made out-
side of work, in social settings, are less likely to constitute ev-
idence of workplace discrimination); *see also Geier v. Med-
tronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (holding that a com-
ment did not constitute direct evidence of discrimination
when it "was made in a casual conversation during a long car
trip, a setting unrelated to discussions of…work deficien-
cies").

Here, both of Ms. LeClaire's comments were unrelated to
work and made in settings outside of the workplace. Her al-
leged comment about her sister-in-law was made after a lunch
outside of the office. Ms. LeClaire identified the ethnicity of
her sister-in-law, but the comment is far too ambiguous to
raise an inference of racial or ethnic discrimination. Her "old
Indian husband" remark was made in a casual conversation
in the bar of a hotel, during a business trip to Atlanta. *Oest*,
240 F.3d at 611. Further, the comment was made over a year
before Ms. Bagwe was terminated. *Tank*, 758 F.3d at 806
("[I]solated comments made over a year before the adverse
action are not evidence of discrimination under the direct
method."). Neither of these alleged comments would allow a
juror to reasonably infer discrimination.

Ms. Papaioannou's alleged comment about Ms. Bagwe,
however, is a closer call. Ms. Papaioannou did not reference
the termination, but she did make a disparaging comment
which referenced Ms. Bagwe's ethnicity, and she made it on
the day of Ms. Bagwe's termination. A single "bit" or "piece"

of evidence, however, is not enough to support a claim of discrimination under the direct method of proof. *Hobgood*, 731 F.3d at 644. We addressed a similar situation in *Dass v. Chicago Board of Education*, 675 F.3d 1060 (7th Cir. 2012). In *Dass*, a teacher who brought a claim of racial discrimination alleged that a principal told her that she should look for a job "on the North Side where most of the Indian kids go." *Id.* at 1063. We held that, "even if the remark had been closer in time" to the adverse action, it could not support a claim of discrimination because "[t]he undisputed facts show[ed] that [the plaintiff] was non-renewed because she could not control her class." *Id.* at 1072. Here, the undisputed facts show that Sedgwick terminated Ms. Bagwe because of interpersonal concerns. Ms. Papaioannou's comment did not reference the termination and was made after the decision already had been made. *See Egonmwan*, 602 F.3d at 850 (holding that a comment did not raise an inference of discrimination because it did not "specifically refer" to the termination and the timing did not raise suspicion). Moreover, Ms. Papaioannou was one of four decisionmakers. She did not make the ultimate decision to terminate Ms. Bagwe, and the record shows that the other decisionmakers based their decision on Ms. LeClaire's independent assessment of the situation. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (holding that a claim that one employer acted in a retaliatory manner had far less merit when three other managers signed off on the decision for independent reasons). Ms. Bagwe cannot survive under the direct method of proof on her discrimination claims.

## 2.  Indirect Method

Under the indirect method, we reach the same result. To

meet her initial burden, Ms. Bagwe must show that "similarly situated employees" who were not members of the protected class were treated more favorably. *Andrews*, 743 F.3d at 234. As discussed above, Ms. Bagwe has failed to identify any similarly situated employees. Ms. Bagwe cannot survive summary judgment under the indirect method of proof because she cannot establish a prima facie case of discrimination. *Tank*, 758 F.3d at 810.

## B.  Ms. Bagwe's Pay Discrimination Claims

Ms. Bagwe also raises claims under § 1981, Title VII, and the IHRA that Sedgwick paid her a low salary relative to her peers on the basis of her race and national origin.

Before we assess the merits of this claim, we must address two procedural obstacles. First, Sedgwick contends that *all* of Ms. Bagwe's claims regarding compensation are time-barred and that we need not reach the merits on any claims of pay discrimination. That is not the case. Under § 1981, a complaint must be filed within four years of the alleged unlawful employment practice. 28 U.S.C. § 1658(a). Ms. Bagwe filed her complaint on April 12, 2011; therefore, in order to be timely, her § 1981 claims must have arisen on or after April 12, 2007.[58]

---

[58] Ms. Bagwe's other claims of pay discrimination have much shorter limitations periods. Under Title VII, a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *see also Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007). Under the IHRA, a claim must be filed with the EEOC within 180 days of the alleged unlawful employment practice. 775 ILCS 5/7A-102(A)(1), (A-1)(1). Ms. Bagwe filed her EEOC charge on December 9, 2009. Therefore, in order to be timely, the

At the very least, Ms. Bagwe's claim that she received a comparatively small merit increase in 2008 is not time-barred.[59] Therefore, at least one of Ms. Bagwe's pay discrimination claims must be considered on the merits.

Second, Ms. Bagwe contends that Sedgwick only challenged the timeliness, but not the substance, of her pay claims. Therefore, she believes that summary judgment on her pay discrimination claims is inappropriate. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."). Ms. Bagwe specifically contends that Sedgwick only addressed Ms. Bagwe's claims about her *raises* and did not address claims about her salary. Ms. Bagwe is mistaken. Sedgwick clearly addressed Ms. Bagwe's "complain[t]s about her

---

cause for her Title VII claims must have arisen on or after March 19, 2009, and the cause for her IHRA claims must have arisen on or after July 7, 2009. Ms. Bagwe may also be able to state a claim based on the paychecks she received after these dates. *See infra* note 59.

[59] Ms. Bagwe may also have claims based on each paycheck she received. Under the paycheck accrual rule, a new limitations period is triggered each time that a plaintiff is paid less than his or her colleagues. *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1025–26 (7th Cir. 2011). The rule applies to Title VII claims, 42 U.S.C. § 2000e-5(e)(3)(A)(3) (Lilly Ledbetter Fair Pay Act), and to § 1983 claims. *Groesch*, 635 F.3d at 1026. We have not determined whether this rule also applies to § 1981 claims. However, because we conclude that Ms. Bagwe cannot succeed on the merits of *any* of her pay discrimination claims, we need not reach this issue today.

2008 pay raise *and her compensation*."[60] We must consider whether summary judgment is appropriate on the merits.

Turning to the merits, we observe that our conclusions on Ms. Bagwe's discrimination claims based on termination necessarily prove fatal to any claim she has made based on unequal pay. As previously discussed, Ms. Bagwe has not presented any similarly situated employee who received a higher salary. Therefore, she cannot prevail under the indirect method of proof. She also has failed to present circumstantial evidence that would suggest that her employers had a discriminatory motive, and therefore she cannot prevail under the direct method of proof.

**C.  Ms. Bagwe's Retaliation Claims**

Ms. Bagwe finally contends that the defendants engaged in a campaign of "escalating retaliation" against her for complaining about workplace discrimination, which ultimately resulted in her termination. Title VII makes it unlawful "for an employer to discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Retaliation also is a cognizable claim under § 1981 and the IHRA. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 398 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (citing 42 U.S.C. § 1981); 775 ILCS 5/6-101.

---

[60] R.143 at 17 (emphasis added); *see also id.* ("[O]nce *all* relevant factors were taken into account, such as experience, time in service, and the 3% budget for merit increases, [Ms. Bagwe's] 2008 salary was equitable." (emphasis in original)).

Retaliation, like discrimination, can be established under the direct or indirect method of proof. *Coleman*, 667 F.3d at 859. Ms. Bagwe cannot establish a retaliation claim under the indirect method because she fails to present any similarly situated employees who were treated more favorably. *See Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 694 (7th Cir. 2014). Therefore, she must proceed under the direct method of proof and show: (1) she engaged in a protected activity; (2) Sedgwick took an adverse employment action against her; and (3) there was a causal connection between the two. *Tank*, 758 F.3d at 807.

Ms. Bagwe satisfies the first element. The parties agree that Ms. Bagwe made several protected complaints in early 2009, including her accusations in February 2009 of Ms. LeClaire's discriminatory comments, a memorandum in April 2009 about her PIP and salary, and an email in July 2009 to Colleague Resources about her salary. However, the parties disagree about whether Ms. Bagwe engaged in earlier protected activity, specifically on May 21, 2008, when she told Ms. Simpson that she was experiencing racial discrimination. Sedgwick contends that Ms. Simpson did not understand this complaint to concern race. However, Ms. Bagwe testified that she explicitly mentioned racial discrimination. We must accept Ms. Bagwe's testimony as true on review of summary judgment. Sedgwick also contends that Ms. Simpson did not report Ms. Bagwe's complaint to any decisionmaker, and therefore no decisionmaker could have possibly retaliated based on a complaint he or she never heard. However, one can reasonably infer that such an accusation would be reported by Colleague Resources to supervisors within Sedg-

wick. For the purposes of summary judgment, we must construe the facts in the light most favorable to Ms. Bagwe and conclude that this conversation also was a protected activity.

We now consider whether these protected statements are causally connected to any adverse employment action. Ms. Bagwe presents a series of events that she believes were adverse actions and argues that Sedgwick engaged in repeated retaliatory responses to her complaints. We have held that a "sequence of protected activity and punitive action *could* lend some support to a reasonable juror's inference of retaliation." *Coleman*, 667 F.3d at 862 (emphasis added). However, temporal proximity, without additional evidence, is "rarely sufficient" to establish a causal connection. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)); *see also Coleman*, 667 F.3d at 861 (noting that a sequence of protected activity and punitive action, without more, "might not be enough" to defeat summary judgment). Here, viewing the events in chronological order, we must consider whether a reasonable juror could find that an adverse employment action occurred and that the action was causally connected to Ms. Bagwe's protected complaints.

Ms. Bagwe first submits that the defendants demonstrated a motive to retaliate before any protected activity took place. In April 2008, Ms. Bagwe complained about her pay, without mentioning race or discrimination. In response, Ms. Papaioannou told her to be careful, and noted to a co-worker that she was "not going to be able to stop" Ms. LeClaire.[61] Ms. LeClaire allegedly yelled at Ms. Bagwe about a week later. Ms. Bagwe

---

[61] R.163-23 at 2.

concedes that these complaints were not protected activity. *See Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) (holding that a complaint must indicate a protected class to constitute protected expression). Nevertheless, she believes that Ms. Papaioannou's and Ms. LeClaire's responses suggest that these decisionmakers had an intent to retaliate in the future. However, the reasonable characterization of these comments is that they simply responded to an employee's general complaints about her pay. In their responses, neither Ms. Papaioannou nor Ms. LeClaire mentioned discrimination, race, or retaliation. Their "generic, forward looking remarks," without more, would not allow a reasonable jury to infer that Sedgwick acted in a retaliatory manner. *Castro*, 786 F.3d at 569.

Next, Ms. Bagwe contends that Sedgwick took its first retaliatory action in March 2009, when she was placed on a PIP. To rise to the level of an adverse action, a change "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (quoting *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2006)). A PIP, without more, does not rise to this level. *Davis*, 651 F.3d at 677; *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009). Ms. Bagwe alleges that this PIP had materially adverse consequences. Specifically, she claims that the PIP prevented her from receiving a performance evaluation, and that the evaluation would have resulted in a pay raise. However, nothing in the record ties the PIP to her evaluation, much less her compensation. Therefore, this PIP is not an adverse employment action.

A PIP could still constitute relevant evidence of retaliation. *Oest*, 240 F.3d at 613. However, nothing in the record suggests that this PIP was pretextual or retaliatory. Ms. Bagwe received the PIP after a confrontation with Ms. Coyle and two detailed complaints sent by Mr. French. The PIP provides a detailed list of concerns regarding Ms. Bagwe's performance, including her refusal to reply to emails or listen to criticism. The PIP does mention Ms. Bagwe's complaints about her coworkers' prejudiced comments, but states that "it was [her] role and responsibility to address the issue at that time and not a year later."[62] The PIP is, on its face, *encouraging* Ms. Bagwe to report allegations of discrimination. It is neither an adverse employment action nor evidence of retaliation.

Ms. Bagwe also alleges that Sedgwick investigated her immediately after she complained of pay discrimination in April 2009 instead of taking her accusations seriously. She believes this investigation was improper and, therefore, constitutes evidence of Sedgwick's retaliatory motive. However, we have held that a company's investigation of a plaintiff immediately after she makes a complaint is "not suspicious," because the company might well need "to determine whether there was a larger problem." *Tank*, 758 F.3d at 805, 807. Indeed, Ms. Simpson explained that Sedgwick's investigation of Ms. Bagwe was "related to the overall investigation of what was occurring in the office with relationships."[63] The subsequent report addressed *both* Ms. Bagwe's complaints and her relationships

---

[62] R.145-18 at 30.

[63] R.145-11 at 14 (71:22–23).

with coworkers. Sedgwick's investigation does not constitute evidence of retaliation.

Finally, Ms. Bagwe claims that she was terminated for retaliatory reasons.[64] A termination is undoubtedly an adverse employment action. *Oest*, 240 F.3d at 613. However, Ms. Bagwe has not linked her termination to her complaints of discrimination, or established that the reasons given by Sedgwick are pretextual. Rather, Sedgwick's rationale for terminating Ms. Bagwe has been consistent and finds support in the record. The PIP laid out in detail the company's concerns with Ms. Bagwe's leadership skills. The investigation showed that Sedgwick took Ms. Bagwe's complaints of discrimination seriously and that its willingness to investigate her claims cannot be characterized as a punitive action. The termination came after numerous complaints from coworkers and Ms. Bagwe's placement on a PIP. *See Langenbach*, 761 F.3d at 800 (affirming summary judgment where the timing and pretext arguments relied on "unbridled speculation," and the record presented a clear history of performance issues). Ms. Bagwe therefore has not met her burden with regard to her claims of retaliation.

---

[64] Ms. Bagwe also argues that Sedgwick engaged in post-termination retaliation by giving a negative recommendation to Matrix. However, as discussed above, that argument is based entirely on inadmissible hearsay. Further, even were we to consider that call, there is nothing in the record suggesting that the call was made for retaliatory reasons.

## Conclusion

For the foregoing reasons, we affirm the district court's judgment.

AFFIRMED